## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

PAMELA J. DOBBINS,                     )
                                       )
                    Plaintiff,         )        **CIVIL ACTION**
                                       )
v.                                     )        No.  06-1013-MLB
                                       )
JOHN E. POTTER, Postmaster             )
General, United States Postal          )
Service,                               )
                                       )
                    Defendant.         )
_____)

## MEMORANDUM AND ORDER

    This matter comes before the court on defendant's motion for
summary judgment.  (Docs. 28, 29.)  The motion has been fully briefed
and is ripe for decision.  (Docs. 33, 35.)  The motion is GRANTED for
the reasons stated more fully herein.

**I.   FACTS**

    This is an employment case involving claims of race and
retaliation discrimination under Title VII of the Civil Rights Act of
1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and disability
discrimination under the Vocational Rehabilitation Act of 1973
("Rehabilitation Act"), 29 U.S.C. § 701 et seq.  (Doc. 27.)  The
following facts are either uncontroverted or, if controverted, taken
in the light most favorable, along with all favorable inferences, to
plaintiff.  See Hall v. United Parcel Serv., No. Civ. A. 992467-CM,
2000 WL 1114841, at *5 (D. Kan. July 31, 2000) (citing Adler v. Wal-
Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)).  To the extent
relevant, the factual disagreements between the parties will be noted.

    Plaintiff, Pamela Dobbins, worked for the United States Postal

Service ("Postal Service") as a distribution clerk, a general mail clerk, or in a modified mail clerk position in Wichita, Kansas.  One common duty of a general mail clerk is to "wall box mail."  Wall boxing mail involves picking up letters and parcels and placing them in a specific box in a bank of mail boxes affixed to a wall in a post office.  The duties that may be assigned to employees of the Postal Service are defined in each employee's job description.  An employee's job description may be modified if the employee is injured on the job.  The Postal Service may temporarily assign an employee to "light duty," provided such work is available, but is not obligated to do so.

The federal Office of Workers Compensation Programs ("OWCP") determines whether Postal Service employees are entitled to benefits under the Federal Employees Compensation Act.[1] When a Postal Employee is injured on the job, the employee can file a claim with the OWCP and if the OWCP determines that the injury is work related, the employee is assigned to "limited duty."  The employee remains on limited duty until the employee's physician determines the employee has reached maximum medical improvement.   After reaching maximum medical improvement, the employee is offered a "modified position," which is structured to meet the work restrictions recommended by the employee's doctor.  If the employee accepts the modified position, it becomes the employee's new job description.  Thereafter, the Postal Service must assign the employee work that falls within the terms of the modified position and the employee is expected to perform the duties of the

---

[1]   See 5 U.S.C. § 8102(a) (providing federal workers' compensation coverage for disabilities sustained while an employee is performing their duty).

-2-

modified position on a regular basis.  If an employee working in a modified position is injured again, the employee must file a new claim with the OWCP and the complete process must be repeated before any additional changes are made to the employee's job description.

Prior to 1998, plaintiff filed three claims with the OWCP. Plaintiff alleged work-related injuries causing bilateral tendinitis in her shoulders, carpal tunnel in her right hand, and a strained neck.  Plaintiff's claims were consolidated and, after reaching her maximum medical improvement, in June 1998 she was offered and accepted a modified position designed to meet her medically verified work restrictions.

The June 1998 modified position was in effect from that date forward.  One of the job duties referenced in the June 1998 modified position was to "wall box mail as needed."[2]  After accepting the June 1998 modified position, plaintiff wall boxed mail while working for the Postal Service at the Munger station, Downtown station, and for a while at the North station.  Plaintiff transferred to the North station in the fall of 1999, and in early 2000 she advised the North station supervisor that she no longer believed she was physically capable of wall boxing mail.  Per a verbal agreement with her supervisor (at some point after 1999 but before 2001), plaintiff was not required to wall box mail at the North station for a period of

_____

[2]  In August 1999, plaintiff's June 1998 modified position was altered to reference the fact that plaintiff moved from the Postal Service's Munger station to the Downtown station.  The modified position continued to include wall boxing mail as one of plaintiff's duties.  The modified position listed wall boxing mail as one of six duties plaintiff was to complete during the first two hours of her shift.

time.

Defendant made multiple requests of plaintiff to provide it with medical evidence that her physical condition had changed since June 1998, to the point that she was incapable of performing the job duties described in her June 1998 modified position. Plaintiff did not provide the medical evidence in a timely manner.  On April 10, 2001, plaintiff refused her supervisor's specific instructions to wall box mail and in a letter of warning dated April 11, 2001, plaintiff was warned that refusing to wall box mail could result in her termination. Subsequent to receiving the letter of warning, plaintiff again refused to wall box mail.  In a notice of removal dated April 16, 2001, plaintiff's employment with the Postal Service was terminated for twice refusing to follow her supervisor's instruction.

Plaintiff filed a formal complaint over her removal which was adjudicated by an arbitrator.  On February 23, 2003, the arbitrator ordered plaintiff reinstated to her modified position because of a procedural deficiency in plaintiff's removal.  Plaintiff returned to work for the Postal Service's North station in March 2003, in the modified position from which she was terminated in April 2001.[3]

Upon returning to work in March 2003, plaintiff informed her supervisor that she was physically incapable of performing all the duties delineated in her June 1998 modified position, and requested "light duty" and modification of her permanent job duties.  At that

---

[3] Plaintiff filed a complaint in this court regarding her April 2001 dismissal and March 2003 reinstatement, but the case was dismissed upon the parties' stipulation of dismissal, prior to the entry of any substantive orders.  See Dobbins v. United States Postal Service, No. 04-1019-JTM-KMH (D. Kan. Jan. 1, 2003).

-4-

time, plaintiff also provided her supervisor with a form from her doctor (dated March 10, 2003) containing a list of recommended work restrictions. Plaintiff's supervisor agreed to try and find plaintiff light duty work on a temporary basis and contacted every Postal Service station in and around Wichita looking for work that would be acceptable to plaintiff. Plaintiff's supervisor stated in an affidavit that none of the Postal Service stations contacted had any work available that met the physical restrictions plaintiff claimed were necessary. Plaintiff testified that she believed there was work available at the Postal Service's Corporate Hills station. Plaintiff's supervisor was able to find some light duty work for plaintiff at the North station, but it was usually only for a few hours a day.

In March 2003, plaintiff filed a claim with the OWCP, but this claim was not accepted by the OWCP, meaning that the OWCP determined that plaintiff's injury was not work related. As a result, the Postal Service did not further modify plaintiff's June 1998 modified position. In May 2003, however, plaintiff was advised of the availability of pursuing an accommodation through the Postal Service's District Reasonable Accommodation Committee ("DRAC"). A Postal Service employee who feels she has become physically disabled may request a "reasonable accommodation of their disabilities" through the DRAC. In assessing an employee's request for a reasonable accommodation, the DRAC first determines whether the employee has a medical condition that has resulted in permanent physical restrictions, based on medical documentation provided by the employee. If the medical evidence shows a medical condition resulting in

-5-

permanent restrictions, the DRAC determines whether the employee's restrictions significantly impact one or more major life activities, and if so, the DRAC determines whether a reasonable accommodation is possible.

Plaintiff's physician provided, on May 23, 2003, a checklist of permanent restrictions for plaintiff that advised that plaintiff's lifting, walking, standing, sitting, and driving, among other things, should be foreclosed or limited.  The DRAC contacted plaintiff on June 18, 2003 and requested clarification from plaintiff and her physician as to how plaintiff's wrist and shoulder conditions resulted in restrictions to plaintiff's walking, sitting, driving, etc.  On June 23, 2003, plaintiff's physician wrote a letter to the DRAC referring the DRAC back to the May 23, 2003 checklist and stating that "everything that you are asking for with regards to diagnosis, prognosis, and any explanation you may need in regards to duties and restrictions" was contained in the May 23, 2003 checklist.  On July 3, 2003, the DRAC sent a letter to plaintiff informing her that her physician's letter simply referred the DRAC to the May 23 checklist, which the DRAC had already determined needed clarification.

In the same July 3 letter, the DRAC again asked for clarification and informed plaintiff that a response was necessary in order to initiate the reasonable accommodation process.  On August 7, 2003, the DRAC sent plaintiff a second request for medical information asking for information within seven days, but plaintiff did not respond.  On August 22, 2003, the DRAC sent a request directly to plaintiff's physician, to which plaintiff's physician apparently responded but did not provide any _additional_ information.  The DRAC

-6-

closed its file on plaintiff's request for a reasonable accommodation and informed the Postal Service of its closure on September 22, 2003. The September 22, 2003 letter informed the Postal Service that plaintiff's DRAC file was closed because plaintiff failed to cooperate by providing necessary medical information.  Plaintiff was advised of the same.

After March 2003, plaintiff did not maintain her "regular" work schedule but worked only the hours available from her supervisor as light duty.  Postal Service employees are expected to maintain a "regular" work schedule which means they are to be present and able to work during their assigned work hours.  On April 11, 2003, in a notice of temporary seven-day suspension, plaintiff was advised that she would be suspended for seven days because of her inability to maintain a regular work schedule.  On October 1, 2003, in a notice of temporary fourteen-day suspension, plaintiff was advised she would be suspended for fourteen days because of her inability to maintain a regular work schedule.  Plaintiff again asked for a permanent light duty position on May 7, 2004, but the Postal Service determined there was not work available for plaintiff for an eight hour day.  On June 4, 2004, in a notice of removal, plaintiff was informed that her employment was terminated because she was unable to perform the job duties detailed in the June 1998 modified position.

In a supervisor's statement in connection with plaintiff's application for disability retirement, plaintiff's supervisor wrote that plaintiff's job performance was "less than fully successful" based on plaintiff's inability to wall box mail.  Plaintiff's supervisor also wrote that plaintiff was granted light duty as an

accommodation and worked light duty through her termination.

After her termination from the Postal Service, plaintiff applied for jobs with other employers.  Plaintiff has worked as a volunteer at a school and a receptionist at a furniture store.  Plaintiff is physically capable of participating in activities that are of central importance to most people's daily lives.  Plaintiff is physically capable of completing household chores, playing with her children, driving a car, tending to matters of personal hygiene, working in her garden, and walking for exercise.  Plaintiff testified that movement of her hands causes her pain but that she was able to garden as long as she stayed within her doctor's restrictions and stretched. Plaintiff does not perform yard work.  Plaintiff testified that she has good and bad days; sometimes she takes her medication and stays in bed, but on good days she tries to have as close to a normal life as possible.  Plaintiff experiences pain in her neck, wrist, and shoulder, even when she is not working.

## II.  ANALYSIS

## A.  Summary Judgment Standards

The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the

substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted); see also Adams v. Am. Guarantee & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (citing Adler). The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment because the factual dispute must be material. See Renfro v. City of Emporia, 948 F.2d 1529, 1533 (10th Cir. 1991).

Defendant initially must show both an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Adler, 144 F.3d at 670. Because plaintiff bears the burden of proof at trial, defendant need not "support [its] motion with affidavits or other similar materials negating [plaintiff's]" claims or defenses. Celotex, 477 U.S. at 323 (emphasis in original). Rather, defendant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of plaintiff's claim. See Adler, 144 F.3d at 671 (citing Celotex, 477 U.S. at 325).

If defendant properly supports its motion, the burden then shifts to plaintiff, who may not rest upon the mere allegation or denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial. See Mitchell v. City of Moore, 218 F.3d 1190, 1197-98 (10th Cir. 2000). In setting forward these specific facts, plaintiff must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Adler, 144 F.3d at 671. If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. See

Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 533 (10th Cir. 1994). Plaintiff "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988). Put simply, plaintiff must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Certain local rules further govern the presentation of facts and evidence. Local Rule 56.1 requires the movant to set forth a concise statement of material facts. D. Kan. Rule 56.1. Each fact must appear in a separately numbered paragraph and each paragraph must refer with particularity to the portion of the record upon which the defendant relies. See id. The opposing memorandum must contain a similar statement of facts. Plaintiff must number each fact in dispute, refer with particularity to those portions of the record upon which she relies and, if applicable, state the number of the defendants' fact that she disputes. The court may, but is not obligated to, search for and consider evidence in the record that would rebut the defendant's evidence, but that plaintiff has failed to cite. See Mitchell, 218 F.3d at 1199; Adler, 144 F.3d at 672. All material facts set forth in the statement of defendant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of plaintiff. See id.; Gullickson v. Sw. Airlines Pilots' Ass'n, 87 F.3d 1176, 1183 (10th Cir. 1996) (applying local rules of District of Utah). A standing order of this court also precludes drawing inferences or making arguments within the

-10-

statement of facts.

The parties need not present evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.  See Thomas v. Int'l Bus. Machs., 48 F.3d 478, 485 (10th Cir. 1995) (internal quotations and citations omitted).  For example, hearsay testimony that would be inadmissible at trial may not be included.  See Adams, 233 F.3d at 1246.  Similarly, the court will disregard conclusory statements and statements not based on personal knowledge.  See Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1382 (10th Cir. 1994) (regarding conclusory statements); Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995) (requiring personal knowledge).  Finally, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e).  See Fed. R. Civ. P. 56(e); D. Kan. Rule 56.1; 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2722 (2d ed. 1983).

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If sufficient evidence exists on which a trier of fact could reasonably find for the plaintiff, summary judgment is inappropriate. See Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

-11-

**B.  Title VII**

Plaintiff brings two claims pursuant to Title VII: race discrimination and retaliation. (Doc. 27 at 17.) Defendant moves for summary judgment on both claims. (Doc. 28.)

**1.  Race Discrimination**

Title VII declares it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The summary judgment framework first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to discrimination claims made pursuant to Title VII.[4] "Under the McDonnell Douglas framework, the plaintiff must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. Once the plaintiff has established a prima facie case, the burden must then shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment action. If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (internal quotations and citations omitted).

To establish a prima facie case of race discrimination under Title VII based on a discharge, a plaintiff must show: "(1) [s]he was

---

[4]    The McDonnell Douglas framework applies to cases without direct evidence of discrimination - i.e., those relying on circumstantial evidence. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006). No direct evidence is alleged here.

a member of a protected class; (2) [s]he was qualified and satisfactorily performing h[er] job; and (3) [s]he was terminated under circumstances giving rise to an inference of discrimination." Salguero v. City of Clovia, 366 F.3d 1168, 1175 (10th Cir. 2004); see also Kendrick, 220 F.3d at 1229 (a plaintiff must show "(1) [s]he belongs to a protected class; (2) [s]he was qualified for h[er] job; (3) despite h[er] qualifications, [s]he was discharged; and (4) the job was not eliminated after h[er] discharge"); Roberts v. Sedgwick County Sheriff's Dep't, 302 F. Supp. 2d 1256, 1262-63 (D. Kan. 2004) (a plaintiff must show "that [s]he is a member of the class protected by the statute; that [s]he suffered an adverse employment action; that [s]he was qualified for the position at issue, and that the position was not eliminated after plaintiff's discharge") (citing Perry v. Woodward, 199 F.3d 1126, 1140-41 (10th Cir. 1999)).

Defendant moves for summary judgment on plaintiff's race discrimination claim on the basis that plaintiff cannot satisfy the second element of her prima facie case - that she was qualified for and satisfactorily performing her job. (Doc. 29 at 22.) In the alternative, assuming plaintiff can establish her prima facie case, defendant moves for summary judgment on the basis that plaintiff's employment was terminated for legitimate and non-discriminatory reasons (Doc. 29 at 27) and no evidence of pretext is present (Doc. 29 at 34). Plaintiff responds that she was satisfactorily performing her position and, therefore, can make a prima facie case. (Doc. 33 at 12.) Plaintiff then argues that she has shown pretext because defendant's stated reason for termination, that plaintiff failed to provide requested medical information that would have excused her

-13-

alleged inability to work her modified position, is untenable because of plaintiff's physician's communications to defendant.[5]  (Doc. 33 at 16.)

The court finds that plaintiff has failed to sustain her burden of establishing a prima facie case.  The uncontroverted facts show that plaintiff was not satisfactorily performing her job.  Plaintiff's job description was established by the June 1998 modified position. The modified position described plaintiff's job duties, and one of those duties was to wall box mail.  Plaintiff was justifiably expected to perform the duties of her modified position, because that modified position was the result of a structured process amongst the OWCP, plaintiff, and plaintiff's doctor.  Plaintiff's modified position was designed to meet her medically verified work restrictions and was in effect from June 1998 to the time plaintiff's employment was terminated.

Plaintiff, however, did not perform the duties established by the June 1998 modified position.  Despite multiple requests by defendant for plaintiff to provide the Postal Service with medical evidence that her physical condition had changed since June 1998, plaintiff did not do so in a timely manner.  Plaintiff attempted to

---

[5]  In defendant's reply, defendant contends that plaintiff failed to respond to its motion for summary judgment on plaintiff's race discrimination claim.  Defendant moved for summary judgment on this claim on the basis that plaintiff could not establish the second prong of her prima facie case.  (Doc. 29 at 22-24.)  Plaintiff responded as detailed above, although she titled the section containing her response "prima facie case disability discrimination," rather than discussing the second prong in the context of a race discrimination claim.  (Doc. 33 at 12.)  Regardless, the court's analysis of plaintiff's prima face case is not affected.  It is clear beyond doubt that plaintiff has never had any evidence that race played a role in her employment relationship with the Postal Service.

establish a work-related injury (in March 2003), but this claim was effectively rejected by the OWCP. Plaintiff then attempted to establish a physical disability requiring a reasonable accommodation through the DRAC (in May through August 2003), but did not provide medical documentation of a medical condition that necessitated permanent physical restrictions. Plaintiff does not controvert that she failed to maintain a regular work schedule and that she failed to perform the duties of her modified position. As a result, plaintiff fails to establish that she was satisfactorily performing her job. See, e.g., EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1193-94 (10th Cir. 2000) (requiring a showing, in establishing a prima facie case of sex discrimination, that the plaintiffs possessed "the basic skills necessary to perform the positions they sought").

     In the alternative, even assuming plaintiff had established her prima facie case, defendant has stated a legitimate, nondiscriminatory basis for termination of plaintiff's employment, to which plaintiff has not shown pretext. Defendant contends, of course, that plaintiff's employment was terminated because plaintiff would not perform the duties detailed in her June 1998 modified position and that plaintiff failed to provide medical documentation that she was unable to do so. (Doc. 29 at 27-33.) An employee's failure to carry out the duties of her position is a legitimate, nondiscriminatory basis for termination of employment. See Plotke v. White, 405 F.3d 1092, 1102 (10th Cir. 2005) (finding that failure to follow supervisor's guidance was "sufficient to shift the burden to [the plaintiff] to show there is a genuine dispute of material fact as to whether the [defendant's] proffered reasons for terminating her are

-15-

pretextual").

"Typically, a plaintiff may show pretext in one of three ways: (1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that . . . [s]he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." Salquero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004) (internal quotation omitted). Plaintiff attempts to show pretext with evidence that the Postal Service's stated reason for terminating her employment--that plaintiff failed to provide medical documentation sufficient to support her contention that she was unable to perform her modified position--was false. (Doc. 33 at 16-18.)

Plaintiff alleges that the record shows that her physician's communications to the DRAC were sufficient to fulfill the DRAC's requests for medical documentation. Contrary to plaintiff's assertion however, the only evidence in the record is that plaintiff's physician's communications to the DRAC were not sufficient. Plaintiff's physician's initial checklist of restrictions reasonably appeared overly broad to the DRAC. It restricted plaintiff's driving, sitting, and standing, despite being based on wrist and shoulder conditions. When asked for clarification, plaintiff's physician failed to clarify his checklist. Despite additional requests, neither plaintiff nor her physician provided additional medical documentation. Plaintiff has not shown that there is a genuine dispute of material fact as to whether the Postal Service's proffered reason for

-16-

terminating her was pretextual.

Plaintiff has alleged absolutely no facts of racial discrimination and does not establish that she was discriminated against because she is a minority. EEOC v. Flasher Co., 986 F.2d 1312, 1321 (10th Cir. 1992) ("Even a finding that the reason given for the [adverse employment action] was pretextual does not compel [a finding of discrimination], unless it is shown to be a pretext for discrimination against a protected class."). Defendant's motion for summary judgment on plaintiff's racial discrimination claim is GRANTED.

### 2. **Retaliation**

Title VII also applies to allegations of retaliation. It is unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice" or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ." 42 U.S.C. § 2000e-3(a). The McDonnell Douglas burden shifting framework also applies to claims of retaliation under Title VII. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1180-81 (10th Cir. 2006). To meet her burden of showing a prima facie case of retaliation, plaintiff must show: "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between her opposition and the employer's adverse action." Id. at 1181.

Defendant moves for summary judgment on plaintiff's retaliation claim on the basis that plaintiff cannot show a causal connection

between her April 2001 EEOC complaint and her June 2004 firing, the third element of a prima facie case.  (Doc. 29 at 24-26.)  Plaintiff contends that her request for accommodations for her physical limitations from the DRAC in 2003 is a protected activity and, therefore, temporal proximity and the resultant requisite causal connection exists.  (Doc. 33 at 15.)  Plaintiff offers no legal support for this contention.

First, the parties have not established the contours of plaintiff's April 2001 complaints, but it is clear that those complaints and the June 2004 firing are too distant to support an inference of a causal connection, and plaintiff has offered no additional support of a causal connection between the two.  See Piercy v. Maketa, 480 F.3d 1192, 1198 (10th Cir. 2007) (stating that "the passage of time does not necessarily bar a plaintiff's retaliation claim if additional evidence establishes the retaliatory motive"); Antonio, 458 F.3d at 1181 ("An employee may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  But unless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." (internal quotations and citations omitted)).  Regardless, plaintiff is not contending that the April 2001 activity is the protected activity for which her retaliation claim is based.

Second, it is clear that a claim for retaliation under Title VII applies to retaliation based on Title VII protected activity.  Title VII prohibits discrimination on the basis of an "individual's race,

-18-

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).
Title VII also prohibits retaliation based on the protection of these
rights.   42 U.S.C. § 2000e-3(a).   Plaintiff's request for
accommodation for her alleged physical limitations is in no way
related to protected activity based on race, which is the basis for
her Title VII claim, or for any other category protected by Title VII.
As a result, plaintiff has failed to make her prima facie case,
because she has not established that she engaged in protected
activity. See, e.g., Anderson v. Academy Sch. District 20, No. 03-
1535, 2004 WL 2757938, at *3 (10th Cir. Dec. 3, 2004) ("[A] vague
reference to discrimination and harassment without any indication that
this misconduct was motivated by race (or another category protected
by Title VII) does not constitute protected activity and will not
support a retaliation claim." (quoting Peterson v. Utah Dep't of
Corrections, 301 F.3d 1182, 1188 (10th Cir. 2002))).

Defendant's motion for summary judgment on plaintiff's
retaliation claim is GRANTED.

## C.   Rehabilitation Act

The Rehabilitation Act provides that "[n]o otherwise qualified
individual with a disability . . . shall, solely by reason of her or
his disability, be excluded from the participation in, be denied the
benefits of, or be subjected to discrimination under any program or
activity receiving Federal financial assistance." 29 U.S.C. § 794(a).
The McDonnell Douglas framework also applies to discrimination claims
brought under the Rehabilitation Act. Cummings v. Norton, 393 F.3d
1186, 1189 (10th Cir. 2005).  To satisfy her burden of making a prima
facie case of wrongful termination under the Rehabilitation Act,

-19-

plaintiff must show: "(1) [s]he was a disabled person under the statute, (2) [s]he was otherwise qualified for the job regardless of the disability, and (3) [s]he was terminated from h[er] employment because of the disability." Id. (internal citations omitted); see also Jarvis v. Potter, __ F.3d __, 2007 WL 2452686, at *6 (10th Cir. 2007) (stating elements as "(1) that [the plaintiff] is disabled under the Act; (2) that [the plaintiff] would be 'otherwise qualified' to participate in the program; (3) that the program receives federal financial assistance (or is a federal agency [or the Postal Service]); and (4) that the program has discriminated against the plaintiff" (quoting McGeshick v. Principi, 357 F.3d 1146, 1150 (10th Cir. 2004))).[6]

Defendant moves for summary judgment on plaintiff's Rehabilitation Act claim on the basis that there is no evidence that plaintiff has a disability within the meaning of the Rehabilitation Act. (Doc. 29 at 45-48.)  Plaintiff responds that she has limitations on major life activities sufficient to establish that she suffers from a disability. (Doc. 33 at 19.)

Under the Rehabilitation Act, an individual with a disability is "any person who--(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is

---

[6]   The Rehabilitation Act incorporates the standards of law utilized in connection with the Americans with Disabilities Act ("ADA"). 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination shall be the standards applied under [the ADA]."). Therefore, courts use cases applying the ADA's standards in evaluating claims made under the Rehabilitation Act. Woodman v. Runyon, 132 F.3d 1330, 1339 n.8 (10th Cir. 1997).

-20-

regarded as having such an impairment." 29 U.S.C. § 705(20)(B).
Plaintiff contends only that she is disabled based on limitations to
her major life activities. Recently, the Tenth Circuit stated:

> The United States Supreme Court defines a
> 'substantial' impairment as one that prevents or
> severely restricts an individual from doing
> activities that are of central importance to most
> people's daily lives and that is permanent or
> long term. We must strictly interpret the term
> 'substantial' to create a demanding standard for
> qualifying as disabled. The ADA regulations
> describe 'substantially limited' as unable to
> perform a major life activity that the average
> person in the general population can perform; or
> significantly restricted as to the condition,
> manner or duration under which an individual can
> perform a particular major life activity as
> compared to the condition, manner, or duration
> under which the average person in the general
> population can perform that same major life
> activity. Factors to be considered are: the
> nature and severity of the impairment; the
> duration or expected duration of the impairment;
> and the permanent or long term impact, or the
> expected permanent or long term impact of or
> resulting from the impairment. An impairment's
> effects are assessed on a case-by-case basis. On
> summary judgment, the ultimate question is
> whether the evidence presented could allow a jury
> to conclude the limitations amount to such severe
> restrictions in the activities that are of
> central importance to most people's daily lives
> that they establish a manual task disability.

Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1216-17 (10th Cir. 2007)
(internal quotations, citations, and alterations omitted); see also
McGeshick, 357 F.3d at 1149 ("A substantial limitation in a major life
activity is having general restrictions on the performance of that
activity in life as a whole, not merely restrictions on the ability
to perform a specific job.").

    Plaintiff experiences pain in her neck, wrist, and shoulder.
Plaintiff admits, however, that she is physically capable of

participating in activities that are of central importance to most people's daily lives. Plaintiff is physically capable of completing household chores, playing with her children, driving a car, tending to matters of personal hygiene, working in her garden, and walking for exercise. Plaintiff did testify that movement of her hands causes her pain but she also testified that she was able to garden as long as she stayed within her doctor's restrictions and stretched. Plaintiff testified that she does not perform yard work, but did not testify that she could not perform yard work. Plaintiff has identified no particular major life activity that she is unable to perform or that she is significantly restricted from performing.[7]

On the record plaintiff has established, a jury could not find "such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability." Berry, 490 F.3d at 1217; see also Holt v. Grand Lake Mental Health Ctr., Inc., 443 F.3d 762, 766 (10th Cir. 2006) (stating that a plaintiff whose "impairments that interfere in only a minor way with the performance of manual tasks" is not disabled). As a result, plaintiff has failed to carry her burden to establish a prima facie case under the Rehabilitation Act. Defendant's motion for summary judgment on plaintiff's Rehabilitation Act claim is GRANTED.

## III.   CONCLUSION

Defendant's motion for summary judgment (Doc. 28) is GRANTED for

---

[7]   Plaintiff does not contend that she is substantially limited from the major life activity of working. See Zwygart v. Bd. of County Comm'rs of Jefferson County, Kan., 483 F.3d 1086, 1092-93 (10th Cir. 2007) (setting forth factors for determining if an impairment substantially limits the major life activity of working).

the reasons stated more fully herein.  The clerk is directed to enter judgment for defendant pursuant to Rule 58.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed five pages.  The response to any motion for reconsideration shall not exceed five pages.  No reply shall be filed.

IT IS SO ORDERED

Dated this ___30th___ day of October 2007, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE